UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO: 07-80802 CIV-MARRA

SECURITIES AND EXCHANGE COMMISSION

                    Plaintiff

v.

HOMELAND COMMUNICATIONS CORPORATION,
FRANCES M. LABARRE, AND JOSEPH YURKIN

                    Defendants

and

OAK TREE ESCROW CORPORATION, LUNA
PAZZA, INC., SMR ACQUISITIONS, INC.,
SMRDEVELOPMENT.COM, INC., AND GLOBAL
SURVEY CORPORATION,

                    Relief Defendants.

_____/

## OMNIBUS ORDER AND OPINION

THIS CAUSE is before the Court upon the Receiver's Motion For Determination of Allowed Claims [DE 128].  The motion is fully briefed and ripe for review.  The Court has carefully considered the motion, the supplemental briefing filed pursuant to the Court's request, and oral argument of counsel.

## Background

In September 2007, the Securities and Exchange Commission ("SEC") filed an emergency action against Homeland Communications Corporation, Frances LaBarre, and Joseph Yurkin, seeking, among other things, emergency *ex parte* relief, including

an asset freeze, temporary restraining orders, preliminary injunctions, and the

appointment of a Receiver over Homeland Communications Corp. ("Homeland").  The

SEC alleged violations of Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933,

and Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder.

The Complaint also named several Relief Defendants who allegedly received ill-gotten

gains.  The Court entered an order granting the requested relief.  The Court's rulings

resulted in the freezing of $1,053,537.

On March 12, 2009, the Court entered its Order Authorizing Claims Process.

The Receiver subsequently sent out Claim Forms to investors and other creditors.

The identity of these investors was ascertained from the numerous files and computer

databases seized from the Defendants that revealed information regarding individuals

who invested in Homeland.

**Applicable Basis for Investors' Claims**

The Court adopts the Receiver's recommendation that the amount for each

investor's claim be limited to the total dollar amount of his or her monetary

investment(s) into Homeland consistent with the specific Homeland fraud set forth in

the SEC's Complaint.  This "dollars invested" or "dollars in" approach is the most

equitable and practical basis for determining the investors' claims.  It is also the most

common and most generally recognized approach to treatment of investor claims in

an equitable receivership or bankruptcy proceeding involving a fraudulent investment

scheme.  *See SEC v. Mutual Benefits Corp.*, No. 04-60573-Civ-Moreno, DE 2188 at 3 (S.D. Fla. Oct. 22, 2008).

**Receiver's Objections to Certain Claims**

        The Receiver's staff and Kapila & Co. have spent a great deal of time reviewing, categorizing, and communicating with investor-victims concerning the returned Claim Forms.  As a result, the information has been compiled into detailed files and comprehensive spreadsheets.  The majority of the Claim Forms have been returned without any objection to the Receiver's recommended claim amount.  With respect to the remaining Claim Forms, on July 30, 2009, the Receiver filed Receiver's Omnibus Objections to Certain Claims Receiver in the Claims Process (DE 126) ("Omnibus Objections").  This document sets forth the basis for the Receiver's objections to 98 investor Claims Forms and six trade creditor Claims Forms.

        The Receiver mailed a copy of its Omnibus Objections to the last known address of each of the 98 investors and 6 trade creditors to which the Receiver filed a claim objection.  The Receiver also included a cover letter to each of these investors and trade creditors setting forth their right to challenge the Receiver's recommendations and the procedures for doing so.  *See* DE 127, Ex. 1.  In addition, the Receiver posted a copy of the Omnibus Objections on the Receiver's website at www.homelandcomm.net.  Twenty written objections remain unresolved and require a ruling from the Court.

**Legal Standard for Equity Receiverships**

In equity receiverships resulting from SEC enforcement actions, district courts have very broad powers and wide discretion to fashion remedies and determine to whom and how the assets of the Receivership Estate will be distributed.  *See SEC v. Elliot*, 953 F.2d 1560, 1566 (11th Cir. 1992) ("The district court has broad powers and wide discretion to determine relief in an equity receivership.  This discretion derives from the inherent powers of an equity court to fashion relief") (citing cases); *see also SEC v. Capital Consultants, LLC*, 397 F.3d 733, 738 (9th Cir. 2005).  When it comes to fashioning a claims process and related distribution plan, "[n]o specific distribution scheme is mandated so long as the distribution is 'fair and equitable.'" *SEC v. P.B. Ventures,* Civ. A. No. 90-5322, 1991 WL 269982, at *2 (E.D. Pa. Dec. 11, 1991).  Similarly, in deciding what claims should be recognized and in what amounts, "the fundamental principle which emerges from case law is that any distribution should be done equitably and fairly, with similarly situated investors or customers treated alike."  *SEC v. Credit Bancorp. Ltd.*, No. 99 Civ. 11395-RSW, 2000 WL 1752979, at *13 (S.D.N.Y. Nov. 29, 2000).  Since any one group of investors in a ponzi-type scheme generally occupies the same legal position as other investors, equity should not permit one group a preference over another, because "equality is equity."  *See Elliot*, 953 F.2d at 1570.

**Non-Homeland Investors**

The jurisdictional basis for the Homeland Receivership is set forth in the SEC's

Complaint as follows :

> From at least May 2005 to the present, Homeland, a purposed wireless
> communication company; LaBarre, the Company's sole officer and
> director; and Yurkin, the Company's vice-president of investor relations,
> have raised at least $1.13 million from approximately 93 investors
> nationwide by offering and selling unregistered securities in the form of
> units consisting of at least one share of Homeland's common stock and
> one warrant.

Complaint, ¶ 2.  During the course of these proceedings, numerous defrauded

investors communicated with the Receiver concerning losses they have suffered as a

result of other non-Homeland investment opportunities orchestrated by the

Defendants.  The Receiver's records indicate that the Defendants or their agents

orchestrated at least ten different investment opportunities other than Homeland.[1]

While substantial sums of money apparently were invested in these various schemes,

it is not apparent to the Receiver that these investment schemes involved securities

---

[1]  The Receiver's investigation into the Homeland fraud has revealed that
Donald LaBarre and his agents were the masterminds behind numerous separate and
distinct frauds.  Beginning at least in 2001, Defendants either participated in
personally soliciting money via telephone cold-calls and/or via the internet for
several non-Homeland "investment schemes," or directing others to do so.  These
"investments" included, among others: (1) Get a Free Casino; (2) Softnet
Communications; (3) Bet Pony; (4) Atlantic West Management; (5) Global Stock St.
Kitts; (6) Shop T.V.; (7) Kansas City Wireless Partners; (8) Texas Wireless Partners; (9)
Pittsburg Wireless Partners; and (10) San Francisco Wireless Partners.

fraud, how the various frauds were committed, or where the funds went.  Despite the SEC's Complaint alleging approximately 93 investors in the Homeland fraud, the Receiver subsequently had communications with over 400 investors concerning complex investment transactions.  The Receiver accepted any claim form that was submitted and later analyzed it for a direct relationship with the Homeland fraud.  To date, over 300 Claim Forms have been returned to the Receiver - many of these unrelated to the Homeland fraud.  The Receiver acknowledges that many investors suffered losses at the hands of the same Defendants using similar methods and means to commit various pre-Homeland frauds, but finds that the various frauds were separate and distinct from the Homeland fraud.  The Receiver explains that non-Homeland investors generally share a number of commonalities: (1) they initially invested into a different investment scheme other than Homeland; (2) their investments occurred prior to the date that Homeland even existed as a corporate entity, and (3) they are unable to show that they later invested money directly into Homeland by purchasing additional Homeland securities.  DE 127 at 12.

**Disputed Claims**

A.      Claims for Consequential Damages

Ms. Hays-Gibbs challenges the Receiver's objection to her claim, asserting that she should be entitled to consequential damages as a result of the Defendants' conduct.  Ms. Hays-Gibbs seeks cancelled check fees, late night telephone calls from

Homeland's agents, harassment, phone disconnection and telephone number changes, and adverse health consequences.

The Court agrees with the Receiver that recognizing consequential damages beyond the original investment would not be practical or equitable.  These types of claims are difficult to verify, both as to their existence and as to their proper amount.  Awarding consequential damages would also potentially lead to inequitable results.  If some claimants were granted consequential damages, the pool of funds available to be distributed to Homeland's other victims would be reduced.  If the funds are distributed equitably to all victims, then each victim, including Ms. Hays-Gibbs, may recover some fraction of their lost investments.  However, if Ms. Hays-Gibbs and others are granted extra consequential damages, the other victims would recover less than their pro-rata share of the seized assets.  Claims for consequential damages will not be allowed.  *See SEC v. Mutual Benefits Corp.*, No. 04-60573-Civ-Moreno, DE 2188 at 3 (S.D. Fla. Oct. 22, 2008).

B.     Kansas City Wireless

The Kansas City Wireless partnership and its individual partners ("KCW Investors") have filed 16 objections asserting that their non-Homeland fraud investment losses should be compensated from the Homeland Receivership estate.  These claimants assert that they should be entitled to the Homeland Receivership funds because they incurred investment losses by some of the same defendants

utilizing the same or similar bank accounts and corporations to perpetuate the

investment schemes.  They assert that they are Relief Defendants' creditors, that

their claims arise from Frances LaBarre's securities violations relating to Kansas City

Wireless; and their funds were deposited at some point into Relief Defendants Oak

Tree and SMR Acquisitions' bank accounts.

While recognizing that the KCW investors were victims of an investment

scheme similar to the scheme that LaBarre employed against the investors of

Defendant Homeland, the Receiver rejected these claims because they are victims of

a different fraud.  The Court ordered the KCW Investors and the Receiver to further

brief the Court regarding these disputed claims.

The KCW Investors argue that the term "Homeland Receivership" is a misnomer

because the Amended Order Appointing Receiver states that the Receiver was

appointed not only over Homeland but also over Oak Tree, SMRD, and the other three

Relief Defendants.  Because the Amended Order Appointing Receiver states that the

Receiver is authorized, empowered and directed, in part to :

> [To] investigate the manner in which the affairs of Homeland and the
> Relief Defendants were conducted and institute such actions and legal
> proceedings, for the benefit and on behalf of Homeland and the Relief
> Defendants and their investors *and other creditors*.

DE 37 at 2-3 (emphasis added),  KCW Investors believe they should be included in the

Receivership umbrella as other creditors.

The SEC describes the purpose of this action in the first paragraph of its

Complaint as follows:

> The Commission brings this action to enjoin Homeland Communications
> Corporation, Frances M. LaBarre and Joseph Yurkin from continuing to
> defraud investors through the ongoing sale of unregistered securities in
> violation of the antifraud and registration provisions of the federal
> securities laws.

DE 1 at 1.  The SEC's position is that "[t]he matter before this Court is quite simple

and clear:  The KCW Investors are not defrauded Homeland investors.  They are not

Relief Defendant investors or other creditors.  They therefore have no claim in this

case."  DE 153 at 2.  The SEC further states that the "Receiver simply has no

authority over non-Homeland and non-Relief Defendant investors and creditors."  DE

153 at 3.

The Court agrees with the SEC.  This Court has found fraud against the

Defendants in this case based on the Homeland fraud.  The Court has entered final

judgments against the Defendants, granted the SEC's motion for a temporary

restraining order, and placed Homeland and the Relief Defendants into a receivership

for the benefit of Homeland and the Relief Defendants' investors and creditors.  The

receivership does not extend to all victims of all purported frauds that involved any

defendant to this case.  Rather, the scope of this receivership is limited, by the

Complaint and the Order granting the SEC's motion for a Receiver, to the Homeland

fraud.[2]  The Receiver states that his "investigation has been substantially thorough and [he has] confirmed that KCW Investors did not invest money directly into Homeland."  DE 139 at 8.

The KCW Investors argue that the Receiver's decision to reject their claims on the grounds that they did not invest in Homeland is contrary to the SEC's stated purpose for filing this action and to the Court's instructions in its Amended Order Appointing Receiver.  "The SEC filed this action to enjoin the Defendants from defrauding investors, not only to enjoin them from defrauding investors of Homeland. . .  The instant Receivership was established, in some measure, for the victims of Labarre's investment schemes whose investments were deposited into accounts belonging to Oak Tree and SMRD.  In order to effectuate the remedial purposes of federal securities laws, the Receiver is required to construe his duties flexibly, and must not deny the KCWP partners' claims on the narrow and technical ground that they were not investors in Homeland."  DE 138 at 4.

_____

[2]  The SEC points out that even if the KCW Investors were investors or creditors of Homeland or the Relief Defendants, their claims would fail because the KCW Investors' funds were spent long before the asset freeze in this case.  Based upon KCW Investor Claims Forms submitted to the Receiver, the KCW investors invested in Kansas City Wireless from 2001 until January 10, 2005.  Pursuant to the Complaint, the Homeland fraud began four months later, in May 2005.  After the KCW Investors' ceased their investments, and when the Homeland fraud commenced in May 2005, only $62,000 remained in the accounts at issue.  Kapila Affidavit, DE 153, Ex. B.  This $62,000 represented not only money relating to KCW business opportunities, but also money relating to nine other business opportunities.

The Court disagrees.  The Receiver's jurisdictional authority is prescribed by the SEC's Complaint and the duty to recover and repatriate the losses of Homeland Investors.  The SEC's Complaint sets forth the following:

> From at least **May 2005** to the present, Homeland, a purposed wireless communications company; LaBarre, the Company's sole officer and director; and Yurkin, the Company's vice-president of investor relations, have raised at least $1.13 million from approximately 93 investors nationwide by **offering and selling unregistered securities** in the form of units consisting of at least one share of Homeland's common stock and one warrant.

Complaint, ¶ 2 (emphasis added).  Accordingly, the Receiver's duties are limited to actions that will result in compensation of the specific victims of the Homeland fraud who "from at least May 2005" were "offer[ed] and s[old] unregistered securities" of "Homeland's common stock" or "warrant[s]."

The Receiver seized records relating to the Homeland investor-victims and actively sought to contact them.  The Receiver has not actively investigated each non-Homeland fraud, seized records relating to these non-Homeland frauds, nor sought to independently contact what likely is hundreds of non-Homeland victims nationwide.

Other non-Homeland claimants who seek compensation from the frozen assets present the following problems:

1.   The participants in the Homeland scheme also engaged in at least ten other schemes which the Receiver believes is beyond his authority to investigate;

2.  The Kansas City Wireless claims date from as early as 2001, well beyond the ascertainable facts;

3.  The "fraudulent" nature of the Kansas City Wireless Partnership is not established - the partnership possesses an active wireless license, and upon information and belief, has been utilized for the benefit of the partnership;

4.  The Receiver had direct communication from the managing members of Kansas City Wireless stating that their investors deliberately chose not to invest in Homeland or to agree to any transfer of their shares into the Homeland entity.

In the end, allowing the KCW Investors' claims would have the inequitable result of taking funds from the Receivership Estate to the detriment of the intended Homeland victim-investors.  If the Receiver was to investigate all the various fraudulent schemes, a great percentage of the Homeland receivership assets would be expended in such an effort, with no likelihood of recovery of additional assets.

The Court finds compensating the victims of other investment schemes, which are outside the scope of the SEC's Complaint (and thus the Receivership), would lead to inequitable and unfair results for those victims who were defrauded directly by the Homeland scheme that is the subject of this litigation.

C.    Shop T.V.

Shop T.V. investor Barbara Kent has filed a challenge asserting that her Shop T.V. investment was an "investment just like the others" and part of a "fraud" for which Defendants "should have to pay interest on my money that they took and lied

about."  As is the case for all other similarly-situated non-Homeland investors, the Court does not believe that Shop T.V. investors can be compensated in these proceedings.  To the extent that Ms. Kent's objection also includes a request for consequential damages, the Court denies that request.  Thus, Ms. Kent's claims are disallowed.

D.    Trade Creditors

The Receiver states that the total amount of investor losses will exceed the amount of recoverable assets that are available for redistribution to investor-victims. As a result, the Receiver placed trade creditors on notice that the Receiver may seek to subordinate and/or reject trade creditor claims in favor of the investor-victims.

Two trade creditors, James H. Batmasian and Timothy Meade d/b/a Wingo Holdings, LLC,[3] have filed challenges to the Receiver's objections.  Both Messrs. Batmasian and Meade conducted business with Defendants.  Mr. Batmasian is seeking compensation for lost rental income in connection with a lease for the Luna Pazza restaurant.

---

[3] Meade objects being designated as a trade creditor.  He states his claim stems from non-payment of the sales tax in the sale of a business.  He seeks $37,220.41.  DE 127-7 at 7.  Meade has not submitted any evidence to support this claim and admits he has no statutory lien.  There are other remedies at law Meade may pursue for this claim.  The Court rejects Meade's objection and this claim will not be allowed.

The Receiver objects to all the claims of the trade creditors, asserting that they should either be rejected or subordinated to the investors' claims.  If the trade creditors' claims are put "second in line" to the investor claims, they will recover nothing because there will not be enough to pay the investors in full.  In support of his position, the Receiver argues that the Receivership is intended to protect and benefit the investors.  Additionally, the Defendants' fraudulent conduct was directed toward Homeland's investors - not the trade creditors with whom it did business.  Furthermore, as between the trade creditors and the victim investors, the investors as a whole are less able to bear the financial costs of Homeland's conduct than are commercial businesses.  Also, early on in this case, Mr. Batmasian engaged in frivolous litigation seeking to prioritize his claim over all other investor claims.  This resulted in the Receiver spending substantial time, energy, and money litigating Batmasian's claim to the detriment of Homeland's defrauded investors.   Lastly, both Messrs. Batmasian and Mead have other remedies at law to pursue their claims.

**James H. Batmasian d/b/a Investments Limited**

The SEC conducted an auction and sold the contents of the restaurant Luna Pazza, Inc.  The proceeds derived from the auction ($56,000) are held by the Receiver and the SEC.

Batmasian is the owner of the premises occupied by Luna Pazza, Inc. and Donald LaBarre pursuant to leases with Batmasian dated October 20, 2002 and May 1,

2003.  DE 152, Exs. A, B.  These leases were assigned to Luna Pazza, Inc. on

September 29, 2004.  DE 152, Ex. C.  Batmasian claims to be owed at least $88,566.00

in rent from Luna Pazza, Inc. and Donald LaBarre.  Batmasian asserts that he "has a

landlord's lien for rent on the furniture, fixtures, goods and chattels brought and put

on the Luna Pazza, Inc. premises," and is "entitled to all the proceeds derived from

the court-ordered auction."  DE 144 at 203.  In support of this argument, Batmasian

primarily relies on two items - (1) the lease signed by Batmasian and assigned to Luna

Pazza, and (2) Batmasian's landlord's lien under Florida Statutes § 83.08.

        Florida law provides that landlords have a lien for rent on a lessee's property

found on the leased premises which is superior to any other lien acquired subsequent

to the lessee's property having been brought on the leased premises.  Fla. Stat. §

83.08(2).  Moreover, paragraph 13 of the leases demonstrates Luna Pazza's pledge of

all property brought onto its premises to Batmasian as security for the payment of

rent.  Specifically, paragraph 13 contains the following language:

> The said Lessee hereby pledges and assigns to the Lessor all the
> furniture, fixtures, goods and chattels of said Lessee, which shall or may
> be brought or put on said premises, as security for the payment of the
> rent and additional rent herein reserved, and the Lessee agrees that the
> said lien may be enforced by distress foreclosure ~~or otherwise at the~~
> ~~election of said Lessor~~.  Lessee hereby authorizes Lessor to file a UCC-1
> financing statement evidencing the security interest of Lessor as
> contained herein, with or without the signature of Lessee as debtor.
> Lessee expressly waives the requirement under section 83.12 of the
> Florida Statutes that the Plaintiff in Distress for Rent action files a bond,
> it being understood that no bond shall be required in such action.

DE 152 at 4, 9, ¶ 14 (strikeout in original).  These contractual and statutory liens predate Homeland's incorporation.

The Receiver implores the Court to exercise its equitable powers and deny Batsmasian his statutorily and contractually mandated landlord's lien rights.  The Receiver recognizes that Batmasian has a secured creditor's claim but believes this Court has the authority to subordinate any "trade creditors" claims because there is not enough money available to pay even the investor-victims their losses.  For support of this contention, the Receiver cites to *SEC v. Mutual Benefits Corp.*, No. 04-60573-Civ-Moreno, DE 2188 at 3 (S.D. Fla. Oct. 22, 2008).   In *Mutual Benefits*, Chief Judge Moreno summarily subordinated six trade creditors claims

> because, among other things, (1) this is an SEC enforcement action designed to protect the *investors*, not the creditors, (2) MBC's fraudulent conduct was directed towards its *investors*, not its creditors (which were paid substantial amounts already), (3) the investors as a whole are less able to bear the financial costs of MBC's conduct than are the creditors, and (4) four of these creditors provided lobbying or legal services to MBC, helping to keep it in business, thereby prolonging the fraud.

*Id*. at 3.

The Receiver also argues that, while the landlord lien statute may prove Batmasian has a superior right as to other trade creditors, it does not trump the entire Receivership and the asset freeze order, protecting the proceeds of the Homeland fraud for later distribution to the victims.  No controlling precedent or rule

of law is provided for this proposition.  No argument was developed or analysis provided to suggest that under the circumstances of this case a constructive trust or equitable lien should be imposed to prevent unjust enrichment.  *See, e.g., In re Financial Federated Title & Trust Inc.*, 273 B.R. 706 (S.D.  Fla. 2001); *U.S. v. Ramunno*, No. 09-10446, – F.3d. –, 2010 WL 935609 (11th Cir. Mar. 17, 2010).

The Receiver also relies on *S.E.C. v. Hickey*, 322 F.3d 1123, 1131 (9th Cir. 2003) which holds that the inherent equitable power of a district court allows it to freeze the assets of a nonparty when that nonparty is dominated and controlled by a defendant against whom relief has been obtained in a securities fraud enforcement action.

Additionally, the Receiver cites this Court's own opinion in which it denied Michael Lauer the right to use his frozen assets to defend himself in a criminal matter.  The Receiver argues, "[l]ike in *Lauer*, this Court should reject Batmasian's attempt to divert the receivership's limited resources to himself as compensation for his lost rents and profits in favor of the government's strong interest in obtaining as full a recovery as possible for the Homeland victims."  DE 151 at 7-8.  The Receiver notes that Batmasian received hundreds of thousands of dollars in rental income that was derived from the Homeland fraud, and that Homeland fraud proceeds were allegedly used not only for Luna Pazza's lease payments, but for its maintenance, improvements, and operating expenses.

None of these arguments persuade this Court to discharge or subordinate the legal contracts made with Batmasian.  Unlike the trade creditors in *Mutual Benefits*, in this case Batsmasian has a statutory lien that gives him a secure position which should have priority over claims of unsecured trade creditor investors.  In this case there are no allegations regarding Batmasian being aware of or participating in any way in the Homeland fraud or any other fraud of the Defendants.  There is also no evidence in this case showing that the investors as a whole are less able to bear the financial costs of Homeland's fraudulent conduct than are the trade creditors.  The Court does not believe that Batmasian's receipt of thousands of dollars in rental payments pursuant to lease contracts is a relevant factor to consider when determining how to equitably distribute frozen assets to similarly situated investors.  The restaurant received the benefit of the use of the premises in exchange for these payments and generated income to make these payments.   The fact that Luna Pazza did not generate sufficient revenue needed to pay all the restaurant's expenses does not justify ignoring the statutory lien.

In the Lauer matter, the Court denied Lauer access to the frozen assets because Lauer was the wrong-doer and was seeking to use ill-gotten gains for his personal use.  Batmasian is an innocent landlord.  The Court's decision in *S.E.C. v. Hickey*, 322 F.3d 1123, 1131 (9th Cir. 2003) does not help the Receiver because that case deals with a nonparty who was dominated and controlled by a defendant against

whom relief had been obtained in a securities fraud enforcement action.  There are no allegations that Batmasian was dominated or controlled by Defendants.  The fact is that $56,000 in the Receivership Estate came from the sale of items that were on the premises on which Batmasian had a statutory  lien.  Accordingly, the Court finds that to subordinate or deny Batmasian his legal right to the proceeds derived from the auction would be inequitable.

**Aggravating Factors Regarding Batmasian's Own Conduct Warranting a Reduction**

The Receiver reports that when he took steps to try to sell the restaurant and terminate expenses, Batmasian's firm engaged the Receiver in negotiations over the purchase of the restaurant.  He reports that they came to a verbal agreement but failed to complete the deal.  The Receiver claims that Batmasian's delays resulted in an approximate one month delay in the auction.  The Receiver seeks to reduce any compensation granted Batmasian by one month's rent or $17,000.

The Court will not reduce Batmasian's claim by $17,000 simply because a negotiated settlement was not reached.  The Receiver has not alleged or presented any evidence of bad faith in the negotiations.  No justification for penalizing Batmasian in this way has been presented.

After the negotiated settlement with Batmasian failed, he initiated a frivolous and wholly improper legal action, filing a state court case to take back the property. He also violated this Court's Order that had been served on Batmasian's company.

Furthermore, Batmasian never served the Receiver with a copy of his state court lawsuit in an improper attempt to obtain a default judgment.  The Receiver was forced to expend time and resources regarding that action and forced to file a contempt motion with this Court.  Finally, some property was sold from a second office on NW 20th Avenue which was not leased from Batmasian.  Batmasian's claim will be set-off by the expenses incurred by the Receivership as follows:

1.      Receiver's attorneys' fees and costs expended to fight Batmasian's frivolous legal actions in state court and in the Homeland case: $5,000.

2.      Property sold at auction from the second office on NW 20th Avenue that was not leased from Batmasian: $1,000.

        According, the Receiver shall pay to Batmasian $50,000 ($56,000 actual proceeds minus $5,000 in aggravating factors and $1,000 for proceeds to which Batmasian has no claim).  Therefore, it is hereby

ORDERED AND ADJUDGED that the Receiver's Motion For Determination of

Allowed Claims [DE 128] is GRANTED as set forth above.

DONE AND ORDERED in Chambers at West Palm Beach, Palm Beach County,

Florida, this 24th day of May, 2010.

_____
KENNETH A. MARRA
United States District Judge

copies to:
All counsel of record